UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

MUSA HOXHAJ, ABDOU EL SHABEINY, AND
RICARDO CORDERO,

                      Plaintiffs,

               -v-

MICHAEL CETTA, INC., MICHAEL CETTA, AND
STEVEN CETTA,

                      Defendants.

-----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__5/15/2023__

21-cv-6486 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

      Defendants Michael Cetta, Inc. ("Sparks"), Michael Cetta, and Steven Cetta (collectively, "Defendants") move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment dismissing the complaint of plaintiffs Musa Hoxhaj, Abdou El Shabeiny, and Ricardo Cordero (collectively, "Plaintiffs") in its entirety. Dkt. No. 37. For the following reasons, the motion for summary judgment is granted in part and denied in part.

## BACKGROUND

      The following facts are undisputed unless otherwise indicated. They are taken from Defendants' Rule 56.1 Statement, Plaintiffs' Rule 56.1 Counterstatement, and the materials submitted by both parties in connection with their motions.

      Sparks is a steakhouse owned by Defendants. Dkt. No. 43 ¶ 1. The three Plaintiffs were long-time employees who work at Sparks. Each was hired as a waiter but ultimately was promoted to be a front-of-house manager. *Id.* ¶¶ 2–7. Cordero was hired at Sparks in 1998 and was promoted to front-of-house manager in 2005; El Shabeiny was hired in 1995 and was

promoted to front-of-the-house manager in 1997; Hoxhaj was hired in 1988 and was promoted to front-of-the-house manager around 1997 or 1998.  *Id.*

In March 2020, Sparks, along with most other businesses in New York, was forced to temporarily close in light of the COVID-19 pandemic.  *Id.* ¶ 33.  It furloughed all of its employees, including Plaintiffs, on March 28, 2020.  *Id.*  Sparks reopened in September 2020, but closed down again shortly afterwards in December 2020.  *Id.* ¶ 34.  It reopened on a permanent basis in February 2021.  *Id.*  However, only a small portion of its workforce was called back.  *Id.* ¶¶ 36–37.  The three Plaintiffs were not called back.

El Shabeiny and Hoxhaj self-identify as Muslim.  *Id.* ¶ 13.  At the time of the furlough, Cordero was sixty-four years' old, El Shabeiny was fifty-six years' old, and Hoxhaj was fifty-four years' old.  *Id.* ¶¶ 9–11.

## PROCEDURAL HISTORY

Plaintiffs initiated this action by filing a complaint on July 27, 2021.  Dkt. No. 1.  They alleged claims for (1) failure to pay overtime wages under the Fair Labor Standards Act ("FLSA"), New York Labor Law ("NYLL"), and New York State Department of Labor Regulations; (2) failure to pay Plaintiffs the tips left for them by patrons of Sparks, as required under NYLL § 196-d; (3) failure to pay spread of hours as required under NYLL and New York State Department of Labor Regulations; (4) failure to provide wage notices as required under NYLL § 198.1-b and 198.1-d; (5) age discrimination under New York City Human Rights Law ("NYCHRL") and New York State Human Rights Law ("NYSHRL"); (6) religious discrimination under NYCHRL for treating Plaintiffs Hoxhaj and El Shabeiny less well than other employees due to their religion.  *Id.*

On January 6, 2023, Plaintiff Cordero and Defendants agreed to a stipulation of dismissal only as to Plaintiff Cordero's age discrimination claim, but not any of Plaintiff Cordero's other claims.  Dkt. No. 36.

Defendants filed this motion for summary judgment with supporting materials, including their Rule 56.1 Statement, on January 6, 2023.  Dkt. Nos. 37–42.  Plaintiffs filed a motion in opposition to Defendants' motion for summary judgment, along with a Rule 56.1 Counterstatement.  Dkt. Nos. 43–48.  In those papers, Plaintiffs state that they "no longer assert wage notice" or "wage statement claims" or any discrimination claims based "on the failure to recall them to work."  Dkt. No. 43 at 10, 12; Dkt. No. 44 at 2.  Defendants filed a reply memorandum in support on March 3, 2023.  Dkt. Nos. 51–52.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). If the movant meets its burden, "the nonmoving party must come forward with admissible

evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co*., 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc*., 68 F.3d 1451, 1456 (2d Cir. 1995)). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-moving party must also demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

## DISCUSSION

Defendants move for summary judgment dismissing all of Plaintiffs' claims. Dkt. No. 41. However, Plaintiffs only oppose Defendants' motion for summary judgment with respect to the claims for unpaid overtime and tips as well as the age and religious discrimination claims under NYCHRL. Dkt. No. 44 at 14. The Court therefore finds that Plaintiffs have abandoned all other claims and grants summary judgment as to them. *See Capak v. Epps*, 2023 WL 2574879, at *2 (S.D.N.Y. Mar. 20, 2023) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to

address the argument in any way." (citation omitted)); *see also Kaye v. U.S. Dep't of Homeland Sec.*, 2018 WL 456303, at *1 & n.2 (S.D.N.Y. Jan. 17, 2018).

The Court next addresses the motion for summary judgment with respect to the claims explicitly addressed by Plaintiffs in their opposition.

## I.      Unpaid Overtime Wages Under FLSA and NYLL

Under FLSA, as a general matter, employers are required to pay employees who work over forty hours per week "not less than one and one-half times the regular rate at which [the employees are] employed" for those overtime hours. 29 U.S.C. § 207(a)(1).  The NYLL imposes a similar requirement.  *See Nunez v. Metro. Learning Inst., Inc.*, 2021 WL 1176219, at *2 (E.D.N.Y. Mar. 29, 2021); *Martinez v. Dannys Athens Diner Inc.*, 2017 WL 6335908, at *2 (S.D.N.Y. Dec. 5, 2017) (stating that the overtime pay requirements under these statutes are "identical").  This requirement is subject to certain exemptions based on employee classification. In particular, the FLSA exempts from the overtime requirement "employee[s] employed in a bona fide executive [or] administrative . . . capacity."  29 U.S.C. § 213(a)(1).

"The question of whether an employee falls under the FLSA executive exemption is a mixed question of fact and law—*i.e.*, how the employee spent his time working is a question of fact, while whether the employee's activities exclude him from overtime benefits is a question of law." *Elghourab v. Vista JFK, LLC*, 818 F. App'x 63, 66 (2d Cir. 2020).  "In determining the application of [an] exemption, courts defer to the Department of Labor's regulations defining the FLSA's scope." *Sexton v. Am. Golf Corp.*, 2015 WL 5884825, at *3 (E.D.N.Y. Oct. 8, 2015) (citing *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 560–61 (2d Cir. 2012)); *see Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 510–11 (2d Cir. 2020) (applying Department of Labor regulations for definitions of executive and administrative exemptions).  Department of Labor regulations classify employees as "executives" if (1) they are "[c]ompensated on a salary

basis . . . at a rate of not less than $684 per week," (2) their "primary duty is management of the enterprise . . . or of a customarily recognized department or subdivision thereof," (3) they "customarily and regularly direct[ ] the work of two or more other employees," and (4) they "ha[ve] the authority to hire or fire other employees or" if their "suggestions and recommendations" on personnel decisions "are given particular weight."  29 C.F.R. § 541.100(a).  Department of Labor regulations classify employees as "administrative" if (1) they are "[c]ompensated on a salary basis . . . at a rate of not less than $684 per week," (2) their "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) their "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  *Id*. § 541.200(a).  New York law "largely tracks" the FLSA. *Chipotle Mexican Grill*, 954 F.3d at 512.  "Th[e] exemptions are 'substantially similar' in scope under the NYLL."  *Nunez*, 2021 WL 1176219, at *2 n.4 (citing cases).

The answer to the question whether an individual employee falls within an exemption depends upon the actual job characteristics and duties of the employee.  *See Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010) (citing *Holzapfel v. Town of Newburgh,* 145 F.3d 516, 521 (2d Cir. 1998)).  The employer bears the burden of establishing that the employee falls within the exemption.  *See Coming Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974). "[I]nquiries into employees' FLSA-exempt status are fact-intensive."  *Cheng Chung Liang v. J.C. Broadway Rest., Inc.*, 2015 WL 5439178, at *2 (S.D.N.Y. Sept. 15, 2015).  "A job title alone is insufficient to establish the exempt status of an employee.  The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations . . . ."  29 C.F.R. § 541.2; *see Nunez*,

2021 WL 1176219, at *3.  Accordingly, whether an employee is exempt is a question rarely susceptible of resolution on a motion for summary judgment.  *See Capaldo v. Remington Long Island Employers*, 2023 WL 2710251, at *19 (E.D.N.Y. Mar. 30, 2023); *Nunez*, 2021 WL 1176219, at *3; *Sexton*, 2015 WL 5884825, at *3; *J.C. Broadway Rest., Inc.*, 2015 WL 5439178, at *2.

This case is not an exception.  Defendants argue that Plaintiffs were properly classified as exempt under either the executive or administrative exemptions under the FLSA and the NYLL. They argue that, while Plaintiffs occasionally assisted wait staff by serving food or clearing tables, their primary duties "were geared toward supervising and directing staff to ensure smooth restaurant operations and impeccable customer service" and they had authority to hire staff and to discipline employees, and to exercise judgment with respect to matters of significance such as the preparation of employee schedules.  Dkt. No. 41 at 9–10.  Plaintiffs counter that they did not have the authority to interview staff or hire employees or to impose discipline and that the setting of schedules and assignment of tables were ministerial tasks.  Dkt. No. 44 at 5–6.  They further argue that the evidence would permit a jury to find that they spent well in excess of eighty percent of their time on customer service and not on managerial duties.  *Id.* at 7.

There are genuine issues of fact as to whether Plaintiffs fit within the executive exemption to the FLSA and the NYLL.  It is undisputed that each of the Plaintiffs was paid a salary in excess of the regulatory threshold to qualify as exempt.  Dkt. No. 43 ¶¶ 15 (Cordero was paid a weekly salary of $1,600 in addition to $250 to cover job-related expenses); 16 (El Shabeiny was paid a weekly salary of $1,800 in addition to $250 to cover job-related expenses); 17 (Hoxhaj was paid a weekly salary of $1,550 after his promotion to manager, which later increased to $1,800, in addition to $250 to cover job-related expenses).  There are genuine

factual issues with respect to the remainder of the elements, including whether the primary duty of the Plaintiffs was the management of the enterprise or of a customarily recognized department or subdivision thereof, and whether Plaintiffs had the authority to hire or fire other employees or their "suggestions and recommendations" on personnel decisions were "given particular weight." 29 C.F.R. § 541.100(a).  In determining whether an employee's primary duty is managerial in nature, U.S. Department of Labor regulations direct the Court to consider whether the employee's duties included:

> [a]ctivities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id*. § 541.102.

The regulations define an employee's "primary duty" as "[t]he principal, main, major or most important duty that the employee performs."  *Id*. § 541.700(a).  Determination of an employee's primary duty is based "on all the facts in a particular case" and includes consideration of "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  *Id.*  Although the amount of time an employee spends on exempt work is not dispositive, it "can be a useful guide" and "employees who spend more than 50 percent of their time performing exempt work will

generally satisfy the primary duty requirement."  *Id.* § 541.700(b).

Defendants rely on the job description for the position of manager, which specifies that managers are "[r]esponsible for overseeing the efficient running and profitability of the restaurant and for managing and supervising servers and bartenders (employees)" and that their responsibilities include "the day-to-day activities for 'front-of-the-house,' which includes managing and supervising their employees," scheduling staff hours and assigning duties, "discipline according to company set policies and procedures," and the "[m]aintain[ce of a] safe, secure, and healthy environment by establishing, following, and enforcing compliance with health and fire standards and procedures."  Dkt No. 38-9 at 2.  Defendants also rely on testimony that the managers set the weekly schedules for the wait staff, Dkt. No. 43 ¶ 22; that if a waiter wanted to change his or her assigned schedule, the waiter needed approval from a manager, Dkt. No. 38-6 at ECF pp. 23, 25, 29 (Cordero testimony that managers were in charge of scheduling staff hours and assigning duties and had authority to approve changes to schedule); Dkt. No. 38-8 at ECF pp. 15–16 (Hoxhaj testimony that waiters had been asked to seek their approval to change their schedule); and that managers had the authority to "write up" members of the wait staff for violating the rules, Dkt. No. 38-6 at ECF pp. 16–17 (Cordero testimony).  There also is testimony that managers were able to give waiters additional vacation time without talking to the front office.  Dkt. No. 38-11 at ECF p. 10 (Steven Cetta testimony).

However, Defendants have not established that the document containing the job description is authentic and thus that it would be admissible in evidence.  *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support . . . a fact cannot be presented in a form that would be admissible in evidence.").  Moreover, there is testimony that, notwithstanding the ability to "write up" a member of the wait staff, Plaintiffs did not have the

authority to discipline any employees.  Dkt. No. 38-6 at ECF pp. 11, 16 (Cordero testimony that he was not involved in disciplining employees ever but instead wrote employees "up for violating the rules" and "took it to the office"); Dkt. No. 52-2 at ECF p. 76 (Hoxhaj testimony that "I couldn't discipline anybody whatsoever"); Dkt. No. 45 ¶ 11.  There further is testimony that Plaintiffs were not involved in hiring or interviewing potential waiters.  Dkt. No. 38-6 at ECF p. 15 (Cordero testimony that he was not involved in hiring or interviewing new prospective employees); *id.* at ECF pp. 34–35 (Cordero testimony that he would review resumes for new servers but did not conduct interviews of prospective candidates); Dkt. No. 38-7 at ECF p. 11 (El Shabeiny testimony that he was not involved in interviewing prospective servers and was never asked to look at a resume or evaluate a candidate); Dkt. No. 52-2 at ECF p. 79 (Hoxhaj testimony that after 2012 he was not involved in interviewing waiters); Dkt. No. 45 ¶ 10.  There also is evidence that Plaintiffs did not have authority to terminate the employment of waiters and were not involved in the decision to terminate waiters.  Dkt. No. 38-6 at ECF p. 36 (Cordero testimony that he was not part of the discussion whether to terminate an employee); Dkt. No. 52-2 at ECF pp. 79–80 (Hoxhaj testimony that after 2012, he was not involved in the decision to terminate anybody); Dkt. No. 45 ¶ 11.  There is evidence that the policy that waiters could not change schedules on their own predated Plaintiffs and was not initiated by Plaintiffs.  Dkt. No. 45 ¶ 3 (Hoxhaj declaration).

Jury questions also abound as to whether the managerial authority that Plaintiffs did exercise was their "primary duty."  29 C.F.R. § 541.100(a).  Plaintiff Cordero testified that his job was "not really as manager" but "was as server, because we were taking care of tables, serving tables."  Dkt. No. 38-6 at ECF p. 22.  According to Plaintiff Hoxhaj, the best description of his duties was that of "captain."  Dkt No. 45 ¶ 2.  He testified that the vast majority of his

time was spent providing customer service.  *Id.* ¶ 20.

There further are factual questions whether Plaintiffs meet the fourth prong for the executive exemption.  There is extensive evidence, detailed above, that Plaintiffs did not have the authority to hire or fire other employees.  As to whether their "suggestions and recommendations" on personnel decisions were "given particular weight," 29 C.F.R. § 541.100(a), the regulations direct that "an occasional suggestion with regard to the change in status of a co-worker" does not suffice, *id.* § 541.105.  It also is not sufficient that an employee could offer opinions as to hiring or firing.  It is important whether they actually offered those opinions and if they were given particular weight.  *See Ik Ho Choi v. Home & Home Corp.*, 2019 WL 4193449, at *5 (E.D.N.Y. Sep. 3, 2019).  There is no evidence, much less undisputed evidence, that Plaintiffs' opinions as to hiring and firing were given any particular weight. Accordingly, summary judgment is denied as to the claim that Plaintiffs are exempt as executive employees.

Summary judgment also is denied on the contention that Plaintiffs are exempt as administrative employees for many of the same reasons that summary judgment is denied on the argument that Plaintiffs are executive employees.  The second element of the administrative employee exemption—whether the employee's primary duty is directly related to management or the general operations of the employer—requires consideration of whether the employee "perform[s] work directly related to assisting with the running or servicing of the business, as distinguished . . . from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  Moreover, "[t]o qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance."  *Id.* § 541.202(a).  Issues of

fact exist because although Defendants point to the role that Plaintiffs had in setting the schedules and assigning jobs, Plaintiffs have offered evidence that they did not decide "how to carry out these tasks" and that the roles were ministerial.  Dkt. No. 45 ¶ 12.  They also offer evidence that the prescribed policy was in effect from before Plaintiffs became managers—it was that "all waiters worked the same number of hours [and] that nobody had more desirable shifts than anyone else."  *Id.* ¶ 13.  All that Plaintiffs did was "write up the names of waiters in the schedule form based on the rotation."  *Id.*  Side jobs and waiter stations were rotated "so that nobody had a better or worse station than anyone else."  *Id.* ¶¶ 14–15.  This evidence indicates that there was no exercise of discretion.  According to Plaintiffs, direction for the dining room came from Steven Cetta and another employee, and not from Plaintiffs.  *Id.* ¶¶ 21, 38.  These factual assertions are sufficient to create issues for trial.

## II.     Unpaid Tips Under NYLL

Plaintiffs allege that Defendants violated NYLL § 196-d because customers left tips for Plaintiffs, but Defendants "refused to give them the tips left for their services" and "instead added those tips to the waiters' tip pool."  Dkt. No. 44 at 10.  Plaintiffs allege three ways in which Defendants failed to give Plaintiffs tips left for them by customers.  First, Plaintiffs allege that customers would note on their bills that the tip was intended for one of the Plaintiffs, but that Defendants paid the tip "into the tip pool instead."  *Id.* at 11.  Next, Plaintiffs allege that they used their employee cards for taking orders but were required to transfer all orders on their cards to a different waiter's card and that the tips left on those orders were put into the tip pool rather than given to Plaintiffs.  *Id.*  Third, Plaintiffs allege that they would occasionally use an employee card of a different employee in order to avoid having to transfer orders placed from their cards to a different waiter's card at closing time, and that the tips left by orders served by

Plaintiffs and listed on these other employee cards were put into the tip pool rather than paid to Plaintiffs.  *Id.*

Defendants argue that they are entitled to summary judgment on this claim because, first, Plaintiffs were "agents" of the restaurant under NYLL § 196-d such that they were statutorily barred from participating in the restaurant's tip pool, and, second, even if Plaintiffs were not "agents" of the restaurant under NYLL § 196-d, they were still not entitled to a portion of the tip pool because the restaurant only allows "wait staff" to participate in the tip pool while Plaintiffs were "[f]ront of the house managers" and thus were not allowed to participate.  Dkt. No. 41 at 10–11.

The Court grants summary judgment as to this claim.  Even if NYLL § 196-d would not prohibit Defendants from including Plaintiffs in the tip pool, it did not require Defendants to include them in the tip pool.  Thus, Plaintiffs claim for unpaid tips fails as a matter of law.

New York Labor Law § 196-d provides:

> No employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee.  This provision shall not apply to the checking of hats, coats or other apparel.  Nothing in this subdivision shall be construed as affecting the allowances from the minimum wage for gratuities in the amount determined in accordance with the provisions of article nineteen of this chapter nor as affecting practices in connection with banquets and other special functions where a fixed percentage of the patron's bill is added for gratuities which are distributed to employees, nor to the sharing of tips by a waiter with a busboy or similar employee.

NYLL § 196-d.

The statute makes it "unlawful for employers or their agents to participate in their subordinates' tip pools."  *Winans v. Starbucks Corp.*, 796 F. Supp. 2d 515, 518 (S.D.N.Y. 2011).  But the statute does not "impose any requirement that an employer provide a tip-inclusive compensation structure for all employees who would be statutorily eligible to participate in a tip

pool." *Id*.  In fact, "the plain language of Section 196–d does not grant any employee a right to participate in tip pools or to receive the proceeds therefrom" but merely "defines who is eligible to participate in tip pools—waiters, busboys, and other similar employees—and who is not— employers, their agents, and any other person." *Id.* at 519.  Thus, simply because "an employee is eligible to participate in a tip pool does not mean that he or she is entitled to do so, nor does the absence of a prohibition effect an entitlement." *Id*.

The determination that a person is an "agent" of the employer ineligible for participation in a tip pool is fact-laden.  It is based on the employee's responsibilities and duties.  An employee may be eligible to participate in a tip pool even if she has some supervisory responsibilities. "[E]mployees who regularly provide direct service to patrons remain tip-pool eligible even if they exercise a limited degree of supervisory responsibility." *Barenboim v. Starbucks Corp.*, 995 N.E.2d 153, 159 (N.Y. 2013).  Rather, "there comes a point at which the degree of managerial responsibility becomes so substantial that the individual can no longer fairly be characterized as an employee similar to general wait staff" under § 196-d.  *Id*. at 160.  The line demarcating such substantial responsibility is "drawn at meaningful or significant authority or control over subordinates." *Id*.  Noteworthy features of such authority "might include the ability to discipline subordinates, assist in performance evaluations or participate in the process of hiring or terminating employees, as well as having input in the creation of employee work schedules, thereby directly influencing the number and timing of hours worked by staff as well as their compensation." *Id*.  Employees "without the capacity to hire, fire or discipline other employees, even restaurant staff characterized as senior floor captains and accorded supervisory responsibilities, are not agents for the purposes of Section 196-d." *In re Starbucks Employee Gratuity Litigation*, 264 F.R.D. 67, 72 (S.D.N.Y. 2009).

Genuine issues of fact therefore exist as to whether Plaintiffs are properly characterized as "agents." Although Plaintiffs and Defendants agree that Plaintiffs "were referred to as managers," there is conflicting evidence regarding the nature of the Plaintiffs' supervisory responsibilities. Dkt. No. 43 at 2. Notably, Plaintiffs identify supporting evidence that they "had limited involvements in disputes" between guests or due to complaints from guests, "were not involved in the hiring of waiters," did not create the policy for manager approval for schedule changes because it was a "long standing rule" that predated Plaintiffs' promotions to managerial roles, and did not have authority to discipline or terminate employees. *Id*. at 7–9.

However, even if there are fact issues as to whether Plaintiffs' responsibilities made them "agents" within the meaning of § 196-d, those issues are not material to the resolution of Plaintiffs' claim. Section 196-d "does not compel an employer to include any particular eligible employee in a tip pool." *Barenboim,* 995 N.E.2d at 156. Rather, the statute is directed to prohibiting "an employer from retaining gratuities" for itself. *Islam v. Morgans Hotel Group Management LLC*, 2019 WL 5722218, at *3 (S.D.N.Y. 2019). In *Barenboim,* the New York Court of Appeals agreed with the determination of the district court in *Winans v. Starbucks Corporation*, 796 F. Supp. 2d 515 (S.D.N.Y. 2011), that Starbucks did not violate § 196-d by excluding assistant store managers ("ASMs") from participation in the tip pools enjoyed by baristas and shift supervisors at its locations. The position of the ASMs in *Winans* was similar to the position taken by Plaintiffs here. The ASMs conceded that they had some managerial responsibilities (such as interviewing applicants, making hiring recommendations, and processing payroll), but they also had customer service tasks. *Id*. at 517. Under Starbucks's policy, customers who wished to leave tips were directed to put them in a collective tip box from where they were distributed to baristas and shift supervisors who serviced customers but not to

ASMs who also serviced customers.  *Id.*  Before the district court, the ASMs contended that

Starbucks violated § 196-d "by excluding them from collective tip box distributions, reasoning

that customers expect that tips will be distributed among all those seen serving in the stores and

that, by excluding ASMs from the tip box, Starbucks [wa]s in effect demanding or redistributing

the ASMs' earned share of tips."  *Id.* at 518.  The district court granted summary judgment for

defendants on the ASMs' § 196-d claim, holding that "even if the Court were to accept

Plaintiffs' allegations as to customers' expectations that the tip proceeds would be distributed

among customer service employees," Starbucks did not violate § 196-d because it was

"undisputed that Starbucks never retained the gratuities in question for itself but rather allowed

tip-eligible customer service employees—and only tip-eligible employees—to share in the tip

proceeds."  *Id.* at 519.

      The New York Court of Appeals "generally agreed" with the district court's reading of

§ 196-d after the Second Circuit certified to it the question whether NYLL permits "an employer

to exclude an otherwise eligible tip-earning employee under § 196-d from receiving distributions

from an employer-mandated tip pool."  995 N.E.2d at 157.  The Court of Appeals held that it was

"clear that Starbucks' decision to exclude assistant store managers from the tip pool is not

contrary to Labor Law § 196-d."  *Id.* at 161.  It, however, left open only the possibility that there

might "be an outer limit to an employer's ability to excise certain classifications of employees

from a tip pool," such as for example, if the employer gave the tips "to only the highest-ranking

eligible employees."  *Id.*

      Sparks's policy here is not meaningfully different from Starbucks's policy at issue in

*Winans*.  Although Plaintiffs argue that under Sparks's policy, "tips intended by patrons to

reward services provided by plaintiffs were diverted by defendants to the waiters' tip pool," Dkt.

No. 44 at 11, that policy differs only in the means by which tips were redistributed from certain tip-eligible employees to other tip-eligible employees and not in the effect of the policy.  Here, as in *Winans*, tips that the customer intended for one set of tip-eligible employees who earned the tip were diverted—or in the words of the *Winans* district court, "redistributed"—to other employees for whom the tips were not intended.  In *Winans*, the employer effected that result by directing customers to use a single tip collection box.  According to Plaintiffs here, Defendants achieved the same result by effectively requiring that all orders be placed on, or transferred to, a waiter card.  Here, as in *Winans*, Plaintiffs bear a different and more elevated title than those permitted to share in the tip pool and received greater compensation.  Plaintiffs were front-of-the-house managers earning a weekly salary of at least $1,550 and as much as $1,800.  Dkt. No. 43 at 5.  Again, as in *Winans*, the employer redistributed tips earned from higher-salaried tip-eligible employees who earned those tips to lower-paid tip-eligible employees who also performed customer service but did not earn the tips.  796 F. Supp. 2d at 518.  The two cases cannot be meaningfully distinguished.  Under the rule in *Winans*, if Plaintiffs had wanted their employer to allow them too to enjoy the tips that they helped generate, the answer would have been for Plaintiffs to bargain with that employer to be allowed to keep those tips as well as to receive their salary.  The NYLL does not give them that relief.

There is only one respect in which this case is not directly controlled by *Winans*.  In *Winans*, the ASMs also alleged that Starbucks forced them "to contribute to the collective tip box money that [wa]s handed directly to them."  *Id*.  The Honorable Chief Judge Laura Taylor Swain of this District did not directly address whether that practice violated §196-d because she concluded that the ASMs had failed to proffer specific facts in support of that claim.  *Id*.  Here, among other claims, Plaintiffs allege that they "were required [by Defendants] to transfer all

orders on their cards to a waiters' card, so that it appeared as if the waiter provided the service to the table." Dkt. No. 44 at 11.  Arguably, the two situations are analogous.  In both, the employer has adopted a policy that, in effect, requires the higher-paid tip-eligible employee to subsidize the class of lower-paid employees, by turning over a tip in his possession to the tip pool in which he is not permitted to share.  But Plaintiffs offer no reason why, under *Winans*, that distinction should make a difference.  Section 196-d, as interpreted by *Winans*, gives the employer flexibility to design a tip policy so long as that tip policy does not result in tips intended for customer-facing employees being diverted to the employer or its agents.  It makes no difference under that law that the tips pass through the hands of the front-of-the-house managers than if they were deposited directly into the tip pool.  In either event, a tip that the customer might have intended to go to one tip-eligible employee ends up being paid to another tip-eligible employee.  *Winans* says that is permissible.  The result cannot be different based on whether a tip is handed to an ASM for the ASM to place in the tip box or, as here, where a tip might be placed on the front-of-the-house manager's card before being transferred to the card of a waiter who is part of the tip pool.  In either event, the ASM or front-of-the-house manager who receives the tip is only the temporary custodian (or bailee) of funds that are generated as a result of work performed on behalf of the employer.  The ASM or front-of-the-house manager has no greater right to the gratuity than if it were deposited into a tip box with a note—"intended for the ASM or front-of-the-house manager."  Summary judgment is therefore granted as to this claim.

## III.    Religious Discrimination Under NYCHRL

Plaintiffs Hoxhaj and El Shabeiny bring a claim for religious discrimination under the NYCHRL, arguing that they were treated "less well than other workers because of" their religious faith.  Dkt. No. 1 ¶ 77.  The NYCHRL "makes it 'an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof . . . to discriminate against [a] person in

compensation or in terms, conditions or privileges of employment' based on actual or perceived membership in a protected group." *Gelin v. City of New York*, 2013 WL 2298979, at *12 (E.D.N.Y. May 24, 2013) (quoting N.Y.C. Admin. Code § 8-107(1)(a)).

"[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).  "To establish a *prima facie* case of discrimination under the NYCHRL, a plaintiff is not required to show an adverse employment action." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 234 (S.D.N.Y. 2021).  Rather, here, Plaintiffs El Shabeiny and Hoxhaj just have to proffer facts that would permit a reasonable jury to conclude that they were treated less well than other employees on account of their religion.  *See Gelin*, 2013 WL 2298979, at *12. "Under this standard, the conduct's severity and pervasiveness are relevant only to the issue of damages," not liability.  *Mihalik*, 715 F.3d at 110.  Indeed, it is irrelevant to liability whether the allegedly discriminatory conduct is "'tangible' (like hiring or firing)." *Williams v. New York City Housing Authority*, 872 N.Y.S.2d 27, 40 (1st Dep't 2009).  "An employer may present a legitimate, non-discriminatory reason for its actions, but it is entitled to summary judgment 'only if the record established as a matter of law that discrimination played *no* role in its actions.'" *Livingston*, 563 F. Supp. 3d at 234 (quoting *Kops v. PPM America, Inc.*, 2016 WL 7188793, at *5 (S.D.N.Y. 2016)).

To avoid summary judgment, Plaintiffs simply need to make a prima facie case that religious discrimination played some role in Defendants' treatment of them and point to some evidence "from which a reasonable jury could conclude that [they] w[ere] treated less well because of [their] religion." *Hamilton v. City of New York*, 563 F. Supp. 3d 42, 59 (E.D.N.Y. 2021).  On the other hand, Defendants are not liable if Plaintiffs fail to show Defendants'

conduct was in any way motivated by discrimination, or if the Defendants prove "the conduct was nothing more than 'petty slights or trivial inconveniences.'" *Kops*, 2016 WL 7188793, at *5 (quoting *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 836 (S.D.N.Y. 2013)).  Summary judgment is available where Defendants "can prove that the alleged discriminatory conduct in question does not represent a 'borderline' situation" between a petty slight or trivial on the one hand and severe discrimination on the other.  Instead, it must be a situation "that could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences." *Williams*, 872 N.Y.S.2d at 41.

Claims under the "NYCHRL are time-barred unless filed within three years of the alleged discriminatory acts." *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007).  However, otherwise time-barred acts "can be considered timely 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 250 (E.D.N.Y. 2012) (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)).  Because Plaintiffs filed this action on July 30, 2021, the statute of limitations bars recovery on claims based on alleged acts of religious discrimination that occurred before July 30, 2018.

The parties agree on certain facts common to both Plaintiffs.  Plaintiffs El Shabeiny and Hoxhaj self-identify as Muslim.  Dkt. No. 43 ¶ 14.  Sparks has a diverse workforce with employees of all religious backgrounds, ethnicities, and ages.  *Id.* ¶ 38.  El Shabeiny and Hoxhaj were not the only Muslims who worked at Sparks.  *Id.* ¶ 39.  Hoxhaj estimated that there were at least six to eight Muslim employees between 2015 and the furlough.  *Id.*

The parties do not dispute that Plaintiffs El Shabeiny and Hoxhaj were "not terminated" or "demoted" and did not "suffer any change in pay or work duties and did not face any adverse employment action because of [their] Muslim faith." *Id.* ¶¶ 41–42. Plaintiff El Shabeiny never complained about religious discrimination. *Id.* ¶ 43. The parties also agree that to reflect its diverse workforce and accommodate employees' religious practices, Sparks allows Muslim employees to use a separate space to pray throughout the workday as customary in their faith and does not prohibit employees from praying, although Plaintiffs also contend that Defendants Steven and Michael Cetta repeatedly expressed disdain for Muslim practices and forbade them from using old table clothes to pray on, even though other employees were permitted to use them for taking naps. *Id.* ¶ 40.

Plaintiffs El Shabeiny and Hoxhaj individually allege that, during the course of their employment, they each suffered or witnessed incidents of religious discrimination, which are disputed. The Court turns to the claims of each Plaintiff now.

### A.    Plaintiff El Shabeiny's Claims

El Shabeiny testified in his deposition that Ernesto,[1] a cook in Sparks's kitchen, refused to heat his meal during Ramadan. Dkt. No. 38-7 at 134. It is undisputed that the incident occurred sometime before 2017. In particular, El Shabeiny testified that the incident occurred when Sayed Mohran, another employee at Sparks, was working as a waiter. Dkt. No. 43 ¶ 45. Mohran ceased to be a server by 2017. *Id.* Accordingly, this conduct falls outside of the statute of limitations.[2]

The complaint also alleges that Sebastian,[3] a friend of Defendant Steven Cetta who

---

[1] El Shabeiny testified that he forgot Ernesto's last name. Dkt. No. 38-7 at 134.

[2] Plaintiff Hoxhaj testified that this incident likely took place in June 2015. Dkt. No. 52-2 at 100.

[3] Sebastian's full name is not provided.

worked as a temporary employee at Sparks, frequently made derogatory comments about people of Muslim faith.  Dkt. No. 1 ¶¶ 49–50.  But it is not disputed that Sebastian last worked at Sparks in 2005 and that he was not Plaintiffs' supervisor.  Dkt. No. 43 ¶ 46.[4]  Thus, this conduct is time-barred.

El Shabeiny also testified that Defendant Steven Cetta "curs[ed] all the time about Muslim people or when they pray."  Dkt. No. 38-7 at 129–30.  He testified that although he never prayed at Sparks, other employees including Plaintiff Hoxhaj did pray and Defendant Steven Cetta often called El Shabeiny on the phone, "cursing the religion" and complaining about Muslim employees taking time during the workday to pray, asking questions such as "how long this religion, this prayer takes?"  *Id*.  He also testified that such interactions between him and Steven Cetta occurred frequently throughout this tenure at Sparks, stating that "it's like this, you know, all the time, day by day," but he did not testify as to a date for any specific incident. *Id*.  Importantly, El Shabeiny testified that Steven Cetta singled El Shabeiny out to express his views on Islam or his frustrations regarding the religious practices of other Sparks employees in part due to El Shabeiny's faith.  Specifically, El Shabeiny testified that Steven Cetta knew he was Muslim but nevertheless continued to make these comments because, according to El Shabeiny, "[Cetta] enjoys to bother [El Shabeiny] with this every time [Cetta] is upset about religion or about Muslims."  *Id*.

Defendants argue that the conduct alleged by El Shabeiny does not rise above the level of

---

[4] For their part, Plaintiffs do not admit in their depositions or papers that Sebastian last worked at Sparks in 2005, but their failure to point to contrary evidence or dispute in their Rule 56.1 Counterstatement deems this fact admitted.  *See Leeber Realty LLC v. Trustco Bank*, 316 F. Supp. 3d 594, 599 (S.D.N.Y. 2018) ("If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule.").

petty slights or trivial inconveniences.  But "petty slight or trivial inconvenience" is an affirmative defense, and accordingly Defendants have "the burden of proving the conduct's triviality under the NYCHRL."  *Mihalik*, 715 F.3d at 111; *see also Richards v. Dep't of Educ. of City of N.Y.*, 2023 WL 2876585, at *1 (S.D.N.Y. Apr. 10, 2023) ("[I]t is an affirmative defense" to suggest that allegedly discriminatory conduct is nothing more than petty slights and trivial inconveniences).  The court in *Williams* made clear that such a defense is just meant to "narrowly target concerns about truly insubstantial cases, while at the same time avoiding improperly giving license to the broad range of conduct that falls between 'severe or pervasive' on the one hand and a 'petty slight or trivial inconvenience' on the other."  872 N.Y.S.2d at 41. Here, "[c]onsidering the totality of the circumstances," Defendants have not offered evidence that would establish that this is "a 'truly insubstantial case.'"  *Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 59 (1st Dep't 2012) (citation omitted).  El Shabeiny's testimony shows that he consistently experienced Steven Cetta "cursing the religion . . . all the time" as well as his grievances against other Muslim employees due to their religious practices.  Dkt. No. 38-7 at 129–30.  A reasonable jury could find that these experiences created a context that "clearly signaled that defendant considered it appropriate to" consistently direct criticisms to a Muslim employee about other Muslim employees for practicing their faith in addition to cursing their employees' religion.  *Hernandez*, 957 N.Y.S.2d at 59; Dkt. No. 38-7 at 129–30.

Defendants also argue that El Shabeiny cannot raise a triable issue of fact regarding any discriminatory animus by Defendants.  Dkt. No. 41 at 15.  Defendants' main argument here is that El Shabeiny, like Hoxhaj, worked for Defendants at Sparks for twenty-three years, and that if they truly had animus toward El Shabeiny or other Muslim employees due to their religion, Defendants would have fired them sooner.  *Id.* at 16.  An employer who makes discriminatory

comments over a period of time, however, does not, as if by adverse possession, acquire the right to continue to make such comments.  An employee is not required to sue at the earliest possible moment he experiences discrimination at the risk that if he does not do so he will be deemed to have forfeited his claim.  The gravamen of a NYCHRL claim is that an employee is treated less well than other employees because of their religion.  That claim arises whenever a plaintiff is subject to differential treatment on the grounds of discrimination.  *See Mihalik*, 715 F.3d at 114 ("Under the NYCHRL, [] differential treatment may be actionable even if it does not result in an employee's discharge.").  It thus is insufficient for Defendants to show that they did not terminate Plaintiffs' employment.  *See id.*  El Shabeiny is not alleging that discriminatory conduct developed out of the blue at some point near the end of his tenure at Sparks.  Indeed, he alleges and testifies to instances of religious discrimination throughout the several decades during which he worked at Sparks, even if claims stemming from some of those incidents are now time-barred.  A reasonable juror could also find that Steven Cetta's alleged comments to and treatment of El Shabeiny evince discriminatory animus.  According to El Shabeiny, Steven Cetta would constantly curse at El Shabeiny about Muslim people.  *See Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020) (disputed issue of fact where record reveals numerous "references by Defendants to Rasmy's religion and national origin—which, in his view, were 'constant[ ].'"); *Abboud v. Cnty. of Onondaga, New York*, 341 F. Supp. 3d 164, 180 (N.D.N.Y. 2018) ("Clearly, discriminatory comments may constitute evidence of discriminatory animus.").

Thus, summary judgment is inappropriate because a reasonable jury could determine that El Shabeiny was treated less well than other employees at Sparks due to his religion.

### B.    Plaintiff Hoxhaj's Claim

Plaintiff Hoxhaj testified that Steven Cetta frequently made offensive comments about his religious faith, such as saying that "there is trouble" anywhere in the world where there are

Muslims and that "Islam is bad."  Dkt. No. 52-2 at 104–05.  Hoxhaj also testified that Steven

Cetta would call Hoxhaj out of the blue to tell him that he "hate[s] Islam," but that Plaintiff "is

okay" even though he is Muslim; that Steven Cetta asked Hoxhaj if he knew the capital of

Pakistan, and when Hoxhaj answered "Islamabad," Steven Cetta corrected him to say the capital

is "Islam is bad"; that Steven Cetta once incorrectly accused and chastised Hoxhaj for bringing a

Quran into the restaurant; that Steven Cetta asked Hoxhaj "how long this F Ramadan going to

last?" when Hoxhaj was fasting during the religious holiday[5]; Steven Cetta did not allow Hoxhaj

to use certain linen table cloths, which were not used on customer tables, to pray; that Steven

Cetta showed Hoxhaj a picture of his wife and mother-in-law with a "Muslim lady" and told

Hoxhaj that "[t]his F Muslim lady" ruined the photo; and that Steven Cetta stated to Hoxhaj that

Muslim people are "crazy" because they do not drink alcohol or have "oral sex."[6]  *Id.* at 102–11.

When Hoxhaj complained of Steven Cetta's comments to Defendant Michael Cetta, Michael

Cetta told Hoxhaj that "Steve is right about these Islam things" and that "Islams are crazy but the

Muslims are okay."  *Id.* at 112.

A reasonable jury could conclude that Plaintiff Hoxhaj was treated less well due to his

religion.  Defendants argue first that remarks such as "Islam is bad" constitute "stray remarks

that did not change the terms and conditions of Plaintiffs' employments," including that there is

no connection between such comments and Plaintiffs' furlough from Sparks, and second that the

alleged instances of religious discrimination are no more than mere petty slights or trivial

inconveniences such that  "any determination by a jury" that "religious bias was responsible for

---

[5] Plaintiff complained that the comments about Ramadan were most recently made in 2019,
which makes them not barred by the statute of limitations.  Dkt. No. 52-2 at 106–07.
[6] Just like El Shabeiny, Hoxhaj alleged that Ernesto, a chef at Sparks, refused to warm up their
meals during Ramadan.  Dkt. No. 52-2 at 101–02.  As discussed above, this claim falls outside of
the statute of limitations period.

the furlough decision would be conjectural at best." Dkt. No. 41 at 19–21. Both arguments fail.

To begin with, Defendants misunderstand the standard for religious discrimination under the

NYCHRL. In order to survive summary judgment, Plaintiffs simply have to point to evidence

from which a reasonable jury could conclude that they were treated less well *in any way* because

of their religion, *see Hamilton*, 563 F. Supp. 3d at 59, and Defendants must fail to show that

religion played *no* part in their treatment of Plaintiffs or that the conduct does not rise above the

level of petty slights or trivial inconveniences, *Kops*, 2016 WL 7188793, at *5. Thus, under the

NYCHRL, Plaintiffs do not have to show that any of the instances of religious discrimination

that they allege led to their furlough. *See Mihalik*, 715 F.3d at 114.

      Summary judgment is also not warranted on the grounds that the alleged comments were

obviously petty slights or trivial inconveniences. Defendants cite, among other cases, *Sosa v.

Loc. Staff, LLC*, 618 F. App'x 19 (2d Cir. 2015), as an example of a comment that was affirmed

as a mere petty slight or trivial inconvenience. But in *Sosa*, the alleged conduct was limited to a

comment from the defendant to the plaintiff, a Latino employee, that he was "so street." *Id.* at

20. Here, Hoxhaj's allegations consist of a series of statements that are hostile to Islam and

Muslim people generally. A reasonable jury could thus find there to be a wide gulf between the

animus in, on the one hand, telling an employee that he is "so street" and, on the other hand, an

employer frequently telling employees that their religious faith "is bad," that he "hate[s]"

Muslims," that practitioners of Islam are "crazy" (citing such reasons as Muslims abstaining

from alcohol and not engaging in "oral sex"), and that there is trouble anywhere Muslim people

live, among other comments. Dkt. No. 52-2 at 102–11.[7] Perhaps "a reasonable victim of

---

[7] The other cases cited by Defendants in support of their argument that Defendant Steven Cetta's
conduct toward Plaintiff Hoxhaj does not rise above the level of petty slights or trivial
inconveniences are also unpersuasive. Defendants cite *Pronin v. Raffi*, 383 F. Supp. 2d 628

discrimination would consider" being told that they are "so street" does not rise above the level of "petty slights and trivial inconveniences," but a reasonable jury could consider the above-mentioned, repeated statements by Steven Cetta and apparently endorsed by Michael Cetta as rising above the level of petty slights and trivial inconveniences into the realm of actionable religious discrimination under the NYCHRL. *Sosa*, 618 F. App'x at 20.

The same analysis as to discriminatory animus, despite Hoxhaj's longstanding employment by Defendants, applies to Hoxhaj's claim as it did to El Shabeiny's claim for religious discrimination under the NYCHRL. *See supra* pp. 23–24. A reasonable jury could also conclude that several of Hoxhaj's experiences with Steven Cetta evince a discriminatory animus. Specifically, claims that Steven Cetta stated to Hoxhaj that as a general rule people of his religious faith are "crazy" but that Hoxhaj happens to be "okay," that Steven Cetta's explanation that people of Hoxhaj's faith are "crazy" (which implies a presumption that Muslim people are crazy) because of his belief that they do not drink alcohol or engage in "oral sex," and that "there is trouble" anywhere Islam is practiced could be viewed by a reasonable juror as reflecting a discriminatory animus. Dkt. No. 52-2 at 104-105; 112. These comments and the attitude behind them, which were explained to Hoxhaj in clear terms, make it possible that a jury could reasonably find that Defendants' behavior was motivated by religious discrimination and that Hoxhaj was subjected to a different work environment than non-Muslim employees. *See*

---

(S.D.N.Y. 2005) (Chin, J.), in which defendant's comment that "[m]aybe [Plaintiff is] too old to be working here" was insufficient to support a claim of age discrimination. *Id*. at 638. But, unlike the comments here, that was a single stray remark and was not made by a decision-maker. Defendants also cite a case in which courts denied liability for the defendant calling a plaintiff a "mental retard case." *Rozenfeld v. Dep't of Design & Constr. of N.Y.C.*, 875 F. Supp. 2d 189, 209 (E.D.N.Y. 2012), *aff'd*, 522 F. App'x 46 (2d Cir. 2013). However, in that case, the court found no connection between the comment and plaintiff's membership in any protected class. *Id*. And, *Ellison v. Chartis Claims, Inc.*, 115 N.Y.S.3d 53 (2019) concerned only two isolated remarks. *Id*. at 59.

*Williams*, 872 N.Y.S.2d at 41 n.30 (noting that "[o]ne can easily imagine a single comment that objectifies women being made in circumstances where that comment would, for example, signal views about the role of women in the workplace and be actionable").  Therefore, Defendants' motion for summary judgment with respect to Hoxhaj's religious discrimination claim is denied.

## IV.    Age Discrimination Under NYCHRL

Defendants also move to dismiss Hoxhaj's and El Shabeiny's NYCHRL claims that they were treated "less well" based on their age.  Dkt. No. 41 at 19.  Defendants argue that Plaintiffs have presented no evidence from which a reasonable juror could conclude that they were treated differently than younger employees and that such treatment was on account of their age.  *Id.*  In response, Plaintiffs note that that Defendants "gloss over the frequent agist remarks made by the restaurant's owner."  Dkt. No. 44 at 14.  Specifically, they note that "[w]henever plaintiffs sought a raise or complained that they were being paid too little, Michael Cetta would acknowledge that they were worth a lot more than he paid them, but that he wasn't going to pay them any more because nobody else would hire them at their age and that the next stop for them was the old age home."  *Id.*

There is a triable issue of fact as to Hoxhaj's and El Shabeiny's NYCHRL claims for age discrimination, as they have provided sufficient evidence that they were treated less well at least, in part, as a result of their age.  *See Dietrich v. City of New York*, 2020 WL 4226591, at *16 (S.D.N.Y. July 23, 2020) ("[A] plaintiff need only show that he has been treated 'less well' because of his age or other protected class." (citation omitted)).  "[W]hile courts may dismiss truly insubstantial cases, even a single comment may be actionable in the proper context, for purposes of the NYCHRL."  *Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y.

2021) (quoting *Bacchus v. New York City Dep't of Educ.*, 137 F. Supp. 3d 214, 245 (E.D.N.Y. 2015)).

Plaintiffs Hoxhaj and El Shabeiny present evidence that they did not receive raises and when they complained about this fact to Michael Cetta, "he would acknowledge that [they] did a great job and were worth much more than he paid [them], but he would say things like 'I don't have to give you a raise because you're too old to be hired by anybody else,' or 'where are you going to go? Your next stop is the old age home.'"  Dkt. No. 45 ¶ 31 (Hoxhaj Declaration). Hoxhaj also testified that every time he would ask Michael Cetta about a raise, Michael Cetta would tell him "You're lucky you have [this] job.  Don't say anything because after this, you're going to a nursing home."  Dkt. No. 52-2 at 96–98.  A reasonable juror could find that these remarks are actionable under the NYCHRL as they were allegedly made repeatedly, by a supervisor, and in direct connection with their requests for a raise, and evinced that Michael Cetta's reason for denying that raise was due to discriminatory animus based on age.  Construing the evidence in Plaintiffs' favor, a reasonable juror could thus conclude from these comments that Plaintiffs were paid less by their employers, at least in part, as a result of their age.  The Court accordingly denies summary judgment as to these claims.[8]

## CONCLUSION

For the reasons discussed, the Court grants summary judgment as to the claims for unpaid tips, failure to pay spread of hours, failure to provide wage notices, and all discrimination claims under the NYSHRL.  The Court, however, denies summary judgment as to the claims for failure

---

[8] Defendants point out that Michael Cetta was older than Plaintiffs.  Dkt. No. 43 ¶ 49.  But, while the fact that Michael Cetta may also have been a member of a protected class creates an inference against discrimination, , that 'inference is not dispositive, since members of a protected class can discriminate against other members of that class.'"  *Conahan v. MedQuest Ltd.*, 2022 WL 16748585, at *7 (S.D.N.Y. Nov. 7, 2022) (quoting *Meyer v. McDonald*, 241 F. Supp. 3d 379, 390–91 (E.D.N.Y. 2017), *aff'd sub nom. Meyer v. Shulkin,* 722 F. App'x 26 (2d Cir. 2018)).

to provide overtime wages under the FLSA and NYLL and the claims for age and religious

discrimination under the NYCHRL.

The Clerk of Court is respectfully directed to close Dkt. No. 37.

SO ORDERED.

Dated: May 15, 2023
New York, New York

                                               LEWIS J. LIMAN
                                   United States District Judge